DRAFT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :
    :    CRIMINAL ACTION
    :    NO. 19-00517
    :
      v.     :
    :
JOHN HAMMOND     :
    :

M E M O R A N D U M

EDUARDO C. ROBRENO, J.            January 24, 2022

## I.    INTRODUCTION

In September 2019, a grand jury indicted Defendant John Hammond on one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). In November 2021, the Grand Jury returned a superseding indictment against Defendant. In addition to possession of a firearm by a felon, Defendant was additionally charged with possession of a machine gun, in violation of 18 U.S.C. § 922(o), and possession of a firearm in violation of 26 U.S.C. §§ 5845(a)(6), (b), 5861 (d), and 5871. The charges stem from evidence recovered from Hammond's home during the execution of a search warrant. Hammond now moves to suppress all evidence seized from his home, as well as the inculpatory statements he made during the execution of the warrant.

Hammond argues (A) the evidence seized from Hammond's residence must be suppressed because (1) the anticipatory warrant contained misstatements and lacked probable cause and (2) law enforcement failed to "knock and announce" before entering the residence (ECF No. 80); (B) Hammond's statements to law enforcement must be suppressed because Hammond was in extreme pain and without his medication when he made the statements (ECF No. 79); and (C) all evidence seized from Hammond's residence and Hammond's inculpatory statements must be suppressed because Hammond's warrantless arrest inside his home was unlawful (ECF No. 60). The Government opposes all three motions.

This memorandum constitutes the Court's findings of fact and conclusions of law with respect to all three of Hammond's motions. For the reason's set forth below, Hammond's motions will be denied.

## II.  FINDINGS OF FACT

The Court held a suppression hearing on November 4, 2021. Homeland Security Investigations Special Agents Cristopher Chase and Thomas Acerno testified in this case, along with Pennsylvania State Police Corporal John Mallon. The Court finds their testimony credible and accepts it as fact.

On August 7, 2019, Customs and Border Protection officers at JFK Airport seized a U.S. Postal Service international mail

parcel originating from China and addressed to Hammond at the address where he resided.[1] The package contained four counterfeit Glock auto-sears, commonly known as "trigger switches," which convert semi-automatic Glock pistols into fully automatic machineguns. U.S. Customs and Border Protection at the JFK Mail Facility notified the Department of Homeland Security Investigations ("HSI").[2] A forensic examination by the Bureau of Alcohol, Tobacco, and Firearms determined that the Glock trigger switches are classified as machineguns.

On August 14, 2019, HSI obtained an anticipatory warrant to search Hammond's residence upon acceptance of the package by an occupant of Hammond's home. The search warrant contained information supporting that (1) a shipment of Glock trigger switches was seized by Customs and Border Protection; (2) the package contained four trigger switches; (3) a database check and surveillance of the area revealed Hammond lived at the address noted on the package; (4) a query of Federal Licensing System indicated that Hammond had not been granted a federal

---

[1]    Special Agent Acerno testified that a database check revealed that Hammond was residing at the address listed on the package—1509 Staley Circle, Harleysville, Pennsylvania. Surveillance of the property revealed that Paige Hammond, Hammond's wife, was also residing at the Harleysville address.

[2]    Hammond does not argue that the trigger switches in the package were not intended for him. Instead, Hammond argues that he only intended to install the trigger switches in a airsoft guns, see infra section IV.A.1.

firearms license to engage in business as a firearms dealer; (5) Hammond did not hold a Special Occupational Taxpayer authorization that would permit him to lawfully deal in items under the National Firearms Act; (6) Pennsylvania State Police records showed a record of firearms associated with the residence, including a handgun registered to Hammond's wife; (7) records showed a history of previous shipments of trigger switches to defendant at the same address at issue in this case, and; (8) a law enforcement database search indicated Hammond was a convicted felon.[3]

On August 15, 2019, Postal Inspector Thomas Gomley conducted an undercover controlled delivery of the package. Gerald Evans, Hammond's father-in-law, accepted the package and signed the delivery receipt. Between five and ten minutes later Officer Mallon announced the officers' presence through a P.A. system as they drove onto Hammond's property. Officer Mallon made the following announcement at least six times: "[O]ccupants of 1509 Staley Circle, this is the PA State Police, we have a search warrant for the residence." Mot. Tr. at 97-98, ECF No. 133-1.

---

[3]   The probable cause affidavit also included information regarding firearms registered to Hammond's father-in-law, Gerald Evans. However, Hammond contests the accuracy of this information. See infra section IV.A.1.

At approximately 10:40 a.m., a team of sixteen officers including HSI agents, a Pennsylvania State Police Emergency Response Team, officers from the Towamencin Township Police Department, and U.S. Postal Inspection Services agents then entered through both the front and back doors and conducted a search of Hammond's home.

While executing the warrant, officers identified the parcel of trigger switches on Hammond's kitchen table. They also observed a Ruger AR-15 semi-automatic rifle with one round in the chamber in the rifle, as well as two additional fully loaded magazines next to the rifle. Officers also recovered the following firearms, ammunition, and controlled substances discovered during their search of the residence: (1) twenty-five additional Glock trigger switches; (2) a Ruger .380 caliber pistol; (3) a Ruger .22 caliber long rifle; (4) two Glock pistols; (5) a Smith and Wesson revolver; (6) assorted ammunition; (7) methamphetamine, suboxone strips, marijuana, and Temazepam; and (8) electronic devices including computers, tablets, and phones.

While the residence was being searched, Hammond was handcuffed. He informed the law enforcement officers, including Special Agents Chase and Acerno, that he regularly took morphine for severe back pain, and he requested his medication. He also requested medication to manage his anxiety and attention deficit

disorder. The agents denied his request as they were not
authorized to provide medication. Hammond's handcuffs were
ultimately removed. HSI Special Agent Chase advised Hammond of
his Miranda rights, and Hammond signed a waiver of Miranda
rights form.

Officers, including Special Agents Chase and Acerno, then
questioned Hammond for approximately two hours with breaks in
between. Special Agents Chase and Acerno found Hammond to be
coherent and responsive to questions for the majority of the
interview. In response to the agents' questioning, Hammond
denied cleaning or loading the Ruger AR-15 semi-automatic rifle.
Special Agent Chase then told Hammond the firearm, magazines,
and ammunition would be fingerprinted. Hammond ultimately
admitted to recently putting the folding stock on the Ruger AR-
15 semi-automatic rifle.

Hammond was taken into custody at approximately 3:20 p.m.,
after the search team finished executing the warrant and seizing
the evidence. HSI agents obtained an arrest warrant for him the
following day at 11:07 a.m. A federal grand jury sitting in the
Eastern District of Pennsylvania returned a three-count
superseding indictment charging Hammond with felon in possession
of a firearm (Count One), in violation of 18 U.S.C. § 922(g)(1),
possession of a machinegun (Count Two), in violation of 18
U.S.C. § Title 18 922(o), and possession of a non-registered

firearm (Count Three), in violation of 26 U.S.C. §§ 5845(a)(6), (b), 5861 (d), and 5871.

Hammond has moved to suppress (A) the evidence seized from his residence because (1) the anticipatory search warrant contained misstatements and lacked probable cause and (2) law enforcement failed to "knock and announce" before entering the residence; (B) Hammond's statements to law enforcement because he did not knowingly and voluntarily waive his Miranda rights; and (C) all evidence and inculpatory statements because Hammond's warrantless arrest inside his home was unlawful. Hammond's motions will be addressed in turn below.

## III. LEGAL STANDARD

"[T]he Government bears the burden at a suppression hearing where . . . the search or seizure was conducted without a warrant. It must establish by a preponderance of the evidence when the seizure occurred and that it was then supported by reasonable suspicion." United States v. Lowe, 791 F.3d 424, 432 n.4 (3d Cir. 2015) (citations omitted).

When the Government seeks to admit statements made during custodial interrogation, it bears the burden of proving by a preponderance of the evidence that a defendant was advised of his Miranda rights and voluntarily and knowingly waived them. Colorado v. Connelly, 479 U.S. 157, 169 (1986).

7

IV.   **DISCUSSION AND CONCLUSIONS OF LAW**

A.   **Motion to Suppress Physical Evidence from Hammond's Residence (ECF No. 80)**

Hammond argues the physical evidence seized from his residence must be suppressed because (1) the anticipatory search warrant contained misstatements and lacked probable cause and (2) law enforcement failed to knock and announce. These arguments are addressed in turn.

1.   Whether the Warrant Contained Misstatements, Lacked Probable Cause, and the Request for a Franks Hearing

Hammond argues the anticipatory search warrant authorizing officers to search his home contained misstatements and lacked probable cause because "the information provided to the Magistrate Judge was misleading and incomplete." Def.'s Mot. to Suppress Evidence, ECF No. 80 at 4. He points to statements in the affidavit indicating that "Glock switches are 'solely and exclusively' used to convert a semiautomatic handgun into a machinegun" and argues that "in fact, it is well known to law enforcement that it is a common practice to use these switches to convert airsoft guns." Id. He also points to evidence that the affidavit misrepresented the number of handguns Hammond's father-in-law, Gerald Evans, owned. Finally, Hammond argues that the numerous characteristics of "firearms traffickers" to which

8

the affidavit refers do not describe him, and the information in the "Background of John Hammond" section of the affidavit "adds little, if anything, to the probable cause analysis." Id. at 5.

In light of the foregoing, Hammond seeks to challenge the veracity of the probable cause affidavit pursuant to Franks v. Delaware, 438 U.S. 154 (1978). The Government argues that Hammond fails to make the necessary showing required for a Franks hearing and, thus, is not entitled to one. See United States v. Brown, 3 F.3d 673, 677 (3d Cir. 1993).

"A two-step mechanism has been developed in order for a defendant to overcome the general presumption of validity with respect to affidavits in support of search warrants." U.S. v. Yokshan, 658 F. Supp. 2d 654, 659 (E.D. Pa. 2009) (Robreno, J.) (first citing Franks, 438 U.S. 154, 171-72 (1978), then citing United States v. Yusuf, 461 F.3d 374, 383 (3d Cir. 2006)). First, to be eligible for a Franks hearing, "the defendant is required to make a 'substantial preliminary showing' that the challenged affidavit contained a statement that was deliberately false or showed a reckless disregard for the truth, and that such statement was material to a finding of probable cause." Id. at 659-660 (first citing Franks, 438 U.S. at 171, then citing Yusuf, 461 F.3d at 383). "[T]o make this preliminary showing, the defendant cannot rest on mere conclusory allegations or a mere desire to cross-examine, but rather must present an offer

9

of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses." Yusuf, 461 F.3d at 383 n.8 (internal quotation marks and citation omitted).

Second, if the Court finds it is necessary to hold a Franks hearing, the defendant must prove by a preponderance of the evidence: "(1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination." Id. at 383 (citing Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997)).

The Third Circuit has explained that "omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know" and "assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting." Id. (quoting Wilson v. Russo, 212 F.3d 781, 787 (3d Cir. 2000)). "When faced with an affirmative misrepresentation, the court is required to excise the false statement from the affidavit. In contrast, when faced with an omission, the court must remove the 'falsehood created by an omission by supplying the omitted information to the original

10

affidavit.'" Id. at 384 (quoting Sherwood, 113 F.3d at 400). The defendant ultimately must prove by a preponderance of the evidence that a hypothetical corrected affidavit does not support a finding of probable cause, in "that the deficiency in the affidavit was material to the original probable cause finding." Id. at 383 (citing Wilson, 212 F.3d at 788).

While the Court did hold a suppression hearing on November 4, 2021, this was not, in itself, a Franks hearing. In his proposed findings of fact and conclusions of law, Hammond appears to skip the first step and assumes that he has made the requisite substantial preliminary showing. However, the Court had the opportunity to evaluate Hammond's argument during the suppression hearing and determine whether Hammond could make the required substantial showing. See, e.g., United States v. Zareck, No. 09-168, 2021 WL 4391393, at *60 (W.D. Pa. Sept. 24, 2021) (noting the court evaluated testimony at a suppression hearing "to determine whether a Franks hearing was warranted.").

Here, the Court finds that Hammond fails to make the required substantial showing. With respect to Hammond's argument that the statement that Glock switches are "solely and exclusively" used to convert a semiautomatic handgun into a machinegun was misleading, the Government argues that this phrase was only used twice and is contained in the relevant statutory language defining machine guns. Title 26, United

States Code, section 5845(b) provides that the term "machinegun" shall include "any part designed and intended <u>solely and exclusively</u>, or combination of parts designed and intended, for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b) (emphasis added). As noted, Hammond argues that because he purchased the trigger switches with the intent of installing them in airsoft guns, it was misleading to state that they were "solely and exclusively" used to convert a weapon into a machinegun. The Government argues that possession of "trigger switches alone constitutes an illegal 'machinegun'" under the statute, regardless of a hypothetical intended use, Gov.'s Opp'n at 9-10, ECF No. 82, and that "one cannot take possession of Glock trigger switches out of the reach of Section 5845(b)'s sanction merely by using it in an airsoft gun or by claiming that it was intended for use in an airsoft gun." Gov.'s Prop. Findings of Fact ¶ 7, ECF No. 133.

At the suppression hearing, Special Agent Chase testified that he consulted with firearms examiners from the Alcohol, Tobacco, and Firearms and "learned that these components would not function on an Airsoft gun, they would not do anything." Mot. Tr. at 60, ECF No. 133-1. Hammond did not provide any evidence that a trigger switch would be compatible with an airsoft gun. Thus, it is immaterial that the affidavit did not explain that an individual may purchase a trigger switch with

the intent of installing it in an airsoft gun. Hammond's argument fails here.

Further, Hammond argues that the "government falsely stated in the affidavit of probable cause that defendant Hammond's father-in-law, Gerald Evans, owned [eleven] firearms when in fact he only owned one firearm." Def.'s Prop. Findings of Fact ¶ 43, ECF No. 137. Hammond argues that Special Agent Acerno, who drafted the affidavit for probable cause, "had a firearms report showing multiple Gerald Evans[es] with different middle initials who owned firearms, but he failed to do the necessary research to determine which Gerald Evans was the father-in-law of defendant Hammond." Id. Instead, Special Agent Acerno represented to the Court that Hammond's father-in-law owned eleven firearms when this was not the case. Hammond argues that this amounts to a reckless disregard for the truth.

Special Agent Acerno conceded during the suppression hearing that the number of firearms attributed to Gerald Evans was wrong. Special Agent Acerno testified that he relied on information from a report provided by other officers. Special Agent Acerno testified that he had no way of knowing that those weapons were attributed to different individuals named Gerald Evans from the report that other officers had prepared. Mot. Tr. At 140, ECF No. 133-1. It is clear that this was merely an

innocent mistake and does not amount to a reckless disregard for the truth.

Regardless, the information was not necessary to a finding of probable cause. The probable cause affidavit included other pertinent details to support a finding of probable cause, including, but not limited to, (1) a query of Federal Licensing System indicated that Hammond had not been granted a federal firearms license to engage in business as a firearms dealer; (2) information that Hammond did not hold a Special Occupational Taxpayer authorization that would permit him to lawfully deal in items under the National Firearms Act; (3) information from Pennsylvania State Police records showing a record of firearms associated with the residence, including a handgun registered to Hammond's wife; (4) records showing a history of previous shipments of trigger switches to Hammond at the same address at issue in this case; and (5) a law enforcement database search indicating that Hammond was a convicted felon. Even if the affidavit had attributed the correct number of firearms to Gerald Evans, probable cause would still exist. Accordingly, Hammond's motion fails on this ground. See, e.g., U.S. v. McKnight, 568 F. App'x 178, 182 (3d Cir. 2014) (noting probable cause may remain even if the court removes a false statement from a probable cause affidavit).

Finally, Hammond argues that "the affidavit goes to great lengths to illustrate several numerous characteristics of 'firearm traffickers'" but "few, if any, of those characteristics describe Hammond." Def.'s Mot. to Suppress Evidence at 5, ECF No. 80. Such characteristics include using techniques to prevent detection of firearms and registering one's car in the name of another person, among others. In response, the Government argues that "[t]he fact that Hammond chose not to employ deceptive means to hide his purchases of counterfeit Glock trigger switches is not a basis to suppress the physical evidence recovered by agents in this case." Gov.'s Opp'n at 12, ECF No. 87. Additionally, Hammond argues that two pages of the affidavit dedicated to the "Background of John Hammond" and the information provided "adds little, if anything, to the probable cause analysis." Def.'s Mot. to Suppress Evidence at 5, ECF No. 80. However, there is no evidence supporting that Special Agent Acerno included this statement with a reckless disregard for the truth. The Court also finds that that these statements were not necessary to a finding of probable cause. Accordingly, Hammond's motion will be denied.

2.  <u>Whether Law Enforcement Knocked and Announced</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures." U.S. Const. amend. IV. The common-law "knock and announce" principle, which indicates that a police officer "ought to announce his presence and authority" before "break[ing] open the doors of a dwelling," forms part of a court's Fourth Amendment reasonableness inquiry. Wilson v. Arkansas, 514 U.S. 927, 929 (1995).

Here, Hammond avers that, "citing concerns for officer safety, law enforcement forcibly entered Hammond's residence without first knocking and announcing." Def.'s Mot. to Suppress Evidence, ECF No. 80 at 11. He argues the officers lacked a reasonable basis for doing so, including because there was no indication that Hammond posed a risk to officer safety.

The Government explains that though they did not have a no-knock warrant, Pennsylvania State Police Trooper Corporal John Mallon was designated by a superior office to make an announcement prior to the execution of the search warrant. Officer Mallon announced the presence of police officers over a state police vehicle loudspeaker before executing the warrant. Officer Mallon repeated, at least six times, "[O]ccupants of 1509 Staley Circle, this is the PA State Police, we have a search warrant for the residence." Mot. Tr. at 97-98, ECF No. 133-1. Officer Mallon started making the announcement when the police vehicle was approximately half a block from Hammond's

residence. Officer Mallon continued making the announcement while the police vehicle was turning into Hammond's driveway.

Hammond appears to argue that because the officers did not physical knock on the door, the officers' entry violated the "knock and announce rule." "The general practice of physically knocking on the door, announcing law enforcement's presence and purpose, and . . . waiting a sufficient amount of time to infer refusal is the preferred method of entry." U.S. v. Combs, 394 F.3d 739, 744 (9th Cir. 2005) (citing U.S. v. Banks, 540 U.S. 31, 43 (2003)). However, "[t]he Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests" and certain circumstances may warrant deviating from the traditional "knock and announce" rule. Wilson v. Arkansas, 514 U.S. 927, 934 (1995)); see Banks, 540 U.S. at 36 ("[W]e have treated reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of circumstances in a given case.").

Courts must consider all the relevant circumstance surrounding an entry including the threat of physical violence, Wilson, 514 at 936, potential destruction of evidence, id., the size of the residence, Banks 540 U.S. at 40, the time of day, id., and if anyone else was likely to be awake, id., among

others. Additionally, the court should "examine what, if any, notice the police gave before entry and the likelihood that the notice alerted those inside the home to the officer's presence and purpose." Combs, 394 F.3d at 745; see also U.S. v. Spikes, 158 F.4d 913, 927 (6th Cir. 1998) (considering that the police alerted the residence to their presence by announcing themselves with a bullhorn).

In this case, Officer Mallon announced the officers' presence six times over the police vehicle's loudspeaker while outside Hammond's home. The officers were aware that a member of the household was awake as Gerald Evans accepted delivery the package approximately ten minutes before entering the home. Though the officers found Hammond in bed, they had repeatedly announced their presence just before 10:40 a.m., so it is reasonable for the Court to conclude that Hammond, or other members of the household, had heard the officers approaching. Finally, the officers were aware that firearms were registered to individuals in the home, which may have presented a danger to the officers. In light of the circumstances, the Court finds that the officers' entry was reasonable. Accordingly, Hammond's motion will be denied.

**B.**    **Motion to Suppress Statements (ECF No. 79)**

Next, Hammond argues the inculpatory statements he made to police must be suppressed because he did not voluntarily waive his Miranda rights.

The Fifth Amendment to the U.S. Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. IV. The Supreme Court has interpreted this provision as prohibiting the prosecution from using statements "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966).

"The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Id. In assessing such a waiver, the Court's inquiry is twofold:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Moran v. Burbine, 475 U.S. 412, 421–22 (1986). The Court assesses a waiver against the totality of the circumstances. See id. at 421 ("Only if the totality of the circumstances

surrounding the interrogation reveal both an uncoerced choice
and the requisite level of comprehension may a court properly
conclude that the Miranda rights have been waived.") (internal
quotation marks and citation omitted).

The Government does not contest that Hammond's statements
stemmed from custodial interrogation, that officers advised him
of his Miranda rights, and that he signed a written waiver of
those rights. Hammond argues this waiver was not voluntary. He
avers that he was in severe pain during the questioning and was
refused morphine for his back pain, as well has medication to
manage his anxiety and attention deficit disorder. He contends
that because he was denied this medication, his waiver of his
rights was made unknowingly and involuntarily. He also contends
that he was "yelling incoherently about everything being the
fault of China." Def.'s Mot. to Suppress Evidence at 3-4, ECF
No. 79. He claims that "[i]t was only after a statement was
obtained from Hammond did law enforcement officers transport him
to the emergency room . . . for treatment." Id. at 2.

Though Hammond told the officers he was in pain, Hammond
refused medical treatment when the officers offered to call
emergency medical services. When electing to waive his rights,
Hammond was presented with the waiver of rights forms so that he
could read the form to himself while the officers read it to him
verbally. Hammond signed his initials next to each line that the

officers went over with him. Hammond also wrote his signature at the bottom of the form. Hammond was then questioned for approximately two hours, with breaks in between. The Court credits the testimony from Special Agents Chase and Acerno that Hammond did not appear to be under the influence of drugs or alcohol. Special Agent Chase also testified that Hammond was generally responsive and that he never fell asleep during the interview. Special Agent Acerno testified that for the majority of the interview, Hammond was responsive to questions, coherent, and that his answers appeared logical. Special Agent Acerno testified that at no point did Hammond ask to speak with a family member or lawyer, Hammond never invoked his right to remain silent, and Hammond never indicated he wished to stop the interview.

Special Agent Chase did testify that towards the end of the two-hour interview, Hammond became increasingly agitated and began to ramble that he was not responsible and that he began to make incoherent statements that he was "deceived by China and that he was the victim" as the package was mailed from China. Mot. Tr. at 97-89, ECF No. 133-1. Special Agent Acerno also testified that Hammond became incoherent during this portion of the interview. As a result, Special Agent Chase then concluded it was necessary to terminate the interview as Hammond was no longer providing responsive answers to questions. However, up

until that point, Hammond was otherwise responsive and reflective and able to answer questions in a clear manner. There is no evidence that Hammond began to ramble about his culpability because he was in pain, or that Hammond was incoherent or unable to answer questions at the start of the interview. There is no evidence that Hammond was coerced into waiving his rights, or that he was incoherent at the time that he waived his Miranda rights.

The Government argues that even if the Court concludes that Hammond was in some pain, the Court may still find that he voluntarily waived his Miranda rights. In United States v. Overington, the police questioned a defendant had just been shot in the foot. No. 07-147, 2007 WL 3119843, at *2 (E.D. Pa. 2007). A detective who was not in uniform entered the defendant's hospital room where he was receiving treatment. Id. The detective did not immediately administer Miranda warnings, but began to interview the defendant. Id. The defendant then made several incriminating statements. Id. The Government argued that the defendant was not in custody for Miranda purposes in part because he had voluntarily submitted to questioning. Id. at *3. The Overington court concluded that:

> While Defendant was wounded and complaining of pain
> during his time in the trauma room, all witnesses who
> testified stated that he understood his surroundings and
> responded coherently to questions. Despite Defendant's
> injury, at no time did he ask [the officer] to stop the

interview, nor is there any indication that [the officer] would have refused to do so if asked. Absent any evidence of police coercion, Defendant's argument that he did not agree to speak voluntarily with the officers-a decision that led to his confession-must fail.

Id. at *5.

Though Overington differs slightly from this case as Hammond was clearly in custody for Miranda purposes, it supports the notion that a defendant may knowingly and voluntarily waive their rights even if they are experiencing some level of pain. See also, e.g., United States v. Breton-Rodriguez, 232 F. App'x 725 (9th Cir. 2007) (The defendant's "waiver of his Miranda rights is not rendered involuntary simply because he was receiving morphine and in considerable pain."); United States v. Ingino, 423 F. Supp. 3d 108, 114 n.5 (M.D. Pa. Nov. 14, 2019) ("numerous courts have found waivers valid despite the fact that a defendant had received pain [or taken] medication.") (citing Overington, 2007 WL 3119843, at *5 n.5) (alteration in original) (collecting cases).

Here, the Court finds that though Hammond may have been in some pain, he was able to knowingly and voluntarily waive his Miranda rights before the start of the interview. Hammond explicitly refused medical treatment and was able to logically and coherently answer questions for most of the interview. Further, there is no evidence that Hammond ever asked the

officers to stop the interview.[4] Accordingly, Hammond's motion will be denied on this ground.

### C.   Motion to Suppress Physical Evidence and Statements from Warrantless Arrest (ECF No. 60)

Hammond also argues that the physical evidence and inculpatory statements at issue must be suppressed because his arrest violated Payton v. New York, 445 U.S. 573, 576 (1980). In Payton, the Supreme Court held that "the Fourth Amendment . . . prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Id.; see also New York v. Harris, 495 U.S. 14, 20 (1990) ("The warrant requirement for an arrest in the home is imposed to protect the home, and anything incriminating the police gathered from arresting [the defendant] in his home, rather than elsewhere, has been excluded, as it should have been.").

Hammond's reliance on Payton is misplaced. Unlike the defendant in Payton, Hammond was arrested after investigators

---

[4]     Hammond was ultimately taken to the emergency room, but this was after the interview had concluded and he was removed from his home and taken to the Customs House for processing. Hammond had complained that he could not feel his legs and was given an M.R.I. This occurred hours after Hammond signed the waiver of rights form, and there is no evidence that this influenced his ability to knowingly and voluntarily waive his Miranda rights.

entered his residence pursuant to a search warrant. The Court finds that after entering, the officers developed probable cause to arrest Hammond based on his Mirandized statement that he recently put a folding stock on the AR-15 rifle. Hammond's argument therefore "misses an important distinction in Fourth Amendment jurisprudence—that between a warrantless <u>entry</u> into the home and a warrantless <u>arrest</u> once inside the home." <u>Cronin v. W. Whiteland Twp.</u>, 994 F. Supp. 595, 601-02 (E.D. Pa. 1998) (Robreno, J.). As this Court has recognized, once an "officer has entered the home lawfully he or she may execute an arrest upon probable cause without a warrant, as if the arrest was executed in a public place." <u>Id.</u> at 602 (citing <u>Sheik-Abdi v. McClellan</u>, 37 F.3d 1240, 1245-46 (7th Cir. 1994) (collecting cases))).[5]

Accordingly, Hammond's motion will be denied here as well.

---

[5]   Hammond's motion also states that "[i]t is notable that the HSI agents did not obtain an arrest warrant for Mr. Hammond until August 16, 2019, at 11:07 a.m." even though Hammond was taken into custody at approximately 3:20 p.m. the day before. Def.'s Mot. to Suppress Evidence at 5-6, ECF No. 60. However, Hammond does not argue that the probable cause determination was "delayed unreasonably." <u>See</u> <u>Cnty. of Riverside v. McLaughlin</u>, 500 U.S. 44, 56 (1991). In any event, such an argument would fail as the officers obtained an arrest warrant within twenty-four hours of Hammond's arrest. <u>See</u> <u>id.</u> ("[A] jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of <u>Gerstein v. Pugh</u>, 420 U.S. 103 (1975)].").

**V.    CONCLUSION**

    For the foregoing reasons, Hammond's motions to suppress will be denied. An appropriate order will follow.